IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

|  |  |  |
|---|---|---|
| BRENDA LYNN GEIGER, *et al*., | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Action No.  3:21cv771 (DJN–EWH) |
| | ) | |
| ABARCA FAMILY INC., | ) | |
| d/b/a LA RUMBA RESTAURANT | ) | |
| & NIGHTCLUB, *et al*., | ) | |
| Defendants. | ) | |
| | ) | |

**REPORT & RECOMMENDATION**
**On Defendants' Motion to Dismiss Plaintiffs' Amended Complaint**

Plaintiffs Brenda Lynn Geiger, Emily Scott, Jennifer Zharinova, Jessica "Jessa" Hinton, Lina Posada, Lucy Pinder, Paola Canas, Sandra Valencia, Tiffany Toth, and Jessica Rockwell (collectively, "Plaintiffs") bring this action against Defendants Abarca Family, Inc., d/b/a La Rumba Restaurant & Nightclub (the "Club") and Does 1 through 5 (the "Doe Defendants") (collectively, "Defendants"), alleging that Defendants misappropriated and used Plaintiffs' images without permission in advertising and promotions for the Club.

This matter comes before the Court pursuant to 28 U.S.C. § 636(b)(1)(B) for a Report and Recommendation on the Club's Motion to Dismiss Plaintiffs' Amended Complaint ("Motion to Dismiss") (ECF No. 18) under Federal Rule of Civil Procedure 12(b)(6). Having considered Plaintiffs' Amended Complaint (ECF No. 13) and the parties' briefs, and for the reasons discussed below, the undersigned RECOMMENDS that the Club's Motion to Dismiss be GRANTED in part and DENIED in part.

# I.  BACKGROUND

When deciding a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure, the court accepts as true the plaintiffs' well-pleaded allegations and views all facts and draws all reasonable inferences in the light most favorable to them. *T. G. Slater & Son, Inc. v. Donald P. & Patricia A. Brennan*, *LLC*, 385 F.3d 836, 841 (4th Cir. 2004) (citing *Mylan Lab'ys, Inc. v. Matkari*, 7 F.3d 1130, 1134 (4th Cir. 1993)). However, the court "'need not accept the [plaintiff's] legal conclusions drawn from the facts,' nor need it 'accept as true unwarranted inferences, unreasonable conclusions, or arguments.'" *Philips v. Pitt Cty. Mem'l Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009) (quoting *Wahi v. Charleston Area Med. Ctr., Inc.*, 562 F.3d 599, 616 n.26 (4th Cir. 2009)). Applying these standards, the undersigned construes the facts as follows for the purpose of resolving the Motion to Dismiss.

## A.  Factual Background

Plaintiffs are a group of "well-known professional model[s]," who earn their "livelihood[s] by modeling and licensing [their] Images to companies, magazines and individuals for the purpose of advertising products and services." (Am. Compl. ¶ 20). The Amended Complaint details each of Plaintiffs' careers, which range from performing in a music video with a Grammy-nominated rapper; to modeling for companies such as Great Clips, Chevrolet Malibu, and Sprint; to being featured in magazines such as *Playboy*, *Seventeen*, and *Maxim*. (Am. Compl. ¶¶ 27–56.)

As models, Plaintiffs place a high value on their good will and reputation, "which is critical in order to maximize their earning potential, book model contracts, and establish each of their individual brands." (Am. Compl. ¶ 21.) The fee paid to a professional model for a photoshoot and the use of her image depends on a number of factors, such as the model's "reputation earning capacity, experience, and demand." (Am. Compl. ¶ 67.) In order to establish and maintain their

brands, Plaintiffs are "necessarily selective concerning the companies, and brands, for which they model." (Am. Compl. ¶ 21.)

The Club operates in Richmond, Virginia, and it is "engaged in the business of selling alcohol and food in an atmosphere were [sic] nude and/or semi-nude women entertain the [Club's] clientele." (Am. Compl. ¶ 57.) The Doe Defendants are "certain yet-to-be-named individuals and/or entities," which include "graphic designers, independent contractors, DJs, social media consultants and/or others" who worked in concert with or at the direction of the Club in creating and publishing the advertisements at issue in this lawsuit. (Am. Compl. ¶ 19.)

Defendants own, operate, and control the Club's social media accounts, including Facebook, Twitter, and Instagram accounts. (Am. Compl. ¶ 58.) At various times between January 2016 and October 2019, Defendants, without compensating Plaintiffs and without obtaining their permission, misappropriated images of Plaintiffs and intentionally altered them to make it appear as though Plaintiffs worked at, endorsed, or were otherwise associated with the Club. (Am. Compl. ¶ 22.) Defendants published the images of Plaintiffs on the Club's website and social media accounts, advertising events at the Club with the intent to "attract clientele to the Club, promote the Club, and thereby generate revenue for Defendants." (Am. Compl. ¶¶ 68–70.) Plaintiffs allege that at "no point were any of the Plaintiffs ever affiliated with the Club, or Defendants." (Am. Compl. ¶ 75.)

### B. Procedural History

On December 13, 2021, Plaintiffs filed their original complaint in this Court. (ECF No. 1.) They subsequently filed an Amended Complaint on March 18, 2022. (ECF No. 13.)

On April 22, 2022, the Club filed the Motion to Dismiss and accompanying Memorandum of Points and Authorities in Support of Motion to Dismiss Pursuant to Federal Rule of Civil

Procedure 12(b)(6) ("Club's Mem.") (ECF No. 19), arguing that each of Plaintiffs' claims should be dismissed. On May 6, 2022, Plaintiffs filed a Memorandum of Law in Opposition to Defendants' Motion to Dismiss or Judgment on the Pleadings ("Pl.'s Mem.") (ECF No. 21). On May 13, 2022, the Club filed a Reply Brief in Support of Defendant's Motion to Dismiss Pursuant to Federal Rule of Civil Procedure 12(b)(6) ("Club's Reply") (ECF No. 22).

On June 9, 2022, Judge Novak referred the Club's Motion to Dismiss to the undersigned for Report and Recommendation. (ECF No. 24.) The Motion to Dismiss is fully briefed and is ripe for review.

## II.  LEGAL STANDARD FOR 12(B)(6) MOTION TO DISMISS

"A motion to dismiss under Rule 12(b)(6) tests the sufficiency of a complaint; importantly, it does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Republican Party of N.C. v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992) (citing 5A Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1356 (1990)). In considering a motion to dismiss, the court will accept a plaintiff's well-pleaded allegations as true and view the facts in a light most favorable to the plaintiff. *Mylan Lab'ys, Inc.*, 7 F.3d at 1134. However, the court "need not accept the legal conclusions drawn from the facts," nor must it "accept as true unwarranted inferences, unreasonable conclusions, or arguments." *Giarratano v. Johnson*, 521 F.3d 298, 302 (4th Cir. 2008) (quoting *Eastern Shore Mkts., Inc. v. J.D. Assocs. Ltd. P'ship,* 213 F.3d 175, 180 (4th Cir. 2000)).

In order to survive review under 12(b)(6), a complaint must contain sufficient factual information to "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *see also* Fed. R. Civ. P. 8(a)(2) ("A pleading that states a claim for relief must contain . . . a short and plain statement of the claim showing that the pleader is entitled to

4

relief."). Mere labels and conclusions declaring that the plaintiff is entitled to relief are insufficient. *Twombly*, 550 U.S. at 555. A claim is facially plausible when the plaintiff pleads facts sufficient to permit the court to draw a reasonable inference that the defendant is liable for the claim. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). However, the court should grant a motion to dismiss where the allegations are purely legal conclusions or do not permit a court to infer more than a possibility of misconduct. *Id.* at 678.

In addition, when reviewing "whether a complaint will survive a motion to dismiss, a court evaluates the complaint in its entirety, as well as documents attached or incorporated into the complaint." *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 448 (4th Cir. 2011) (citing *Sec'y of State for Defence v. Trimble Navigation Ltd.*, 484 F.3d 700, 705 (4th Cir. 2007)); *see also Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 166 (4th Cir. 2016) (noting that on a motion to dismiss, the court considers "documents that are explicitly incorporated into the complaint by reference" and "those attached to the complaint as exhibits"). Consequently, in reviewing the Club's Motion to Dismiss, the undersigned will consider the exhibits—depicting the advertisements at issue—attached to Plaintiffs' Amended Complaint.

### III.   ANALYSIS

Plaintiffs bring the following four causes of action in their suit against Defendants: (1) violation of Plaintiffs' right of publicity, unauthorized use of likeness under Virginia Code § 8.01–40; (2) violation of Virginia's business conspiracy statute under Code § 18.2–499(A); (3) false advertising under § 43 of the Lanham Act; and (4) false association under § 43 of the Lanham Act. The Club moves to dismiss each count, arguing that Plaintiffs have failed to state a claim upon which relief can be granted. The Club also argues that some of Plaintiffs' claims are time-barred. The undersigned addresses each argument in turn.

5

**A. Count I: Unauthorized Use of Likeness (Va. Code § 8.01-40)**

In their first cause of action, Plaintiffs allege that Defendants violated Virginia Code § 8.01–40 when Defendants misappropriated Plaintiffs' images and published them on the Club's website or social media accounts in an effort to attract clientele and generate business. (Am. Compl. ¶¶ 83–92.) Plaintiffs further allege that Defendants did not have Plaintiffs' permission or consent to use the images. (Am. Compl. ¶¶ 93–94.)

Pursuant to Virginia Code § 8.01–40(A), a claim may be brought for the unauthorized use of a person's name or image where a person's "name, portrait, or picture is used" without his or her consent "for advertising purposes or for the purposes of trade." However, there are certain exceptions to the general prohibition against appropriation, including an exception for "uses that are 'incidental' to the purpose of the work." *Williams v. Newsweek, Inc.*, 63 F. Supp. 2d 734, 737 (E.D. Va. 1999) (citing *Groden v. Random House, Inc.,* 61 F.3d 1045, 1049 (2nd Cir. 1995)), *aff'd*, 202 F.3d 262 (4th Cir. 1999). Under the incidental use exception, "[a] publisher only will be liable for the publication of an unauthorized picture if there is a 'direct and substantial connection between the appearance of the plaintiff's name or likeness and the main purpose and subject of the work.'" *Id.* (quoting *D'Andrea v. Rafla–Demetrious*, 972 F. Supp. 154, 157 (E.D.N.Y. 1997)). Stated differently, when the use of the image is sufficiently isolated, fleeting, or insignificant, the publishing party will not be liable. *Preston v. Martin Bregman Prods., Inc.*, 765 F. Supp. 116, 120 (S.D.N.Y. 1991).[1]

---

[1]     Courts in the Fourth Circuit and the Supreme Court of Virginia have relied on New York courts' interpretation of a similarly worded New York statute for guidance in construing Virginia Code § 8.01–40(A). *See Williams*, 63 F. Supp. 2d at 736 (collecting cases); *Town & Country Props., Inc. v. Riggins*, 457 S.E.2d 356, 362 (Va. 1995).

The Club argues that Plaintiffs have failed to state a claim for a violation of this statute because "the alleged use of Plaintiffs' likeness is incidental to the main purpose of the subject publications." (Club's Mem. at 4.) More specifically, the Club contends that each social media post is clearly intended to advertise an event at the Club and that Plaintiffs' images are unrelated to that main purpose. (Club's Mem. at 7.) According to the Club, Plaintiffs' photographs are "merely taking up space on the page of the post." (Club's Mem. at 9.) In support of its argument, the Club relies on *Williams v. Newsweek, Inc.*, 63 F. Supp. 2d 734, 737 (E.D. Va. 1999), *aff'd*, 202 F.3d 262 (4th Cir. 1999) and *D'Andrea v. Rafla–Demetrious*, 972 F. Supp. 154 (E.D.N.Y. 1997), *aff'd*, 146 F.3d 63 (2d Cir. 1998).

In *Williams*, the plaintiff, an inmate proceeding *pro se*, sued Newsweek for violating Virginia Code § 8.01–40(A) because Newsweek had used the plaintiff's image in an article about another inmate who had written a memoir concerning his involvement with drugs and crime as a youth in Virginia. 63 F. Supp. 2d at 735. The photograph of plaintiff was one of six in the Newsweek article, and it portrayed the memoirist with plaintiff and other prisoners. *Id.* The article described the image as the memoirist with his "Virginia prison buddies." *Id.* The court in *Williams* concluded that the plaintiff's image was incidental to the article because it did not mention plaintiff's name and because the main purpose of the article was to share the memoirist's life story.[2] *Id.* at 738. In addition, the *Williams* court rejected the plaintiff's argument that his image was not incidental because it was deliberately chosen due to his handsomeness. The court noted that, even accepting plaintiff's assertion as true, the plaintiff's image was still incidental to the article as a whole because plaintiff's handsomeness was not related the article's purpose. *Id.*

---

[2]      The *Williams* court also concluded that Newsweek's use of the plaintiff's image met the "newsworthy" exception to Virginia Code § 8.01–40(A), because the author's story and account of his life was a matter of public interest. 63 F. Supp. 2d at 736–37.

In *D'Andrea*, the plaintiff brought suit under New York's invasion of privacy statute against his former employer, a hospital, for using his photograph without his consent in a brochure promoting the hospital's medical internships and residencies. 972 F. Supp. at 155. The plaintiff's photograph, which depicted him and a doctor reviewing a medical chart, took up half a page of space in the sixteen-page brochure. *Id.* at 156. The brochure did not include plaintiff's name and the text did not reference his photograph. *Id*. The brochure also contained photographs of 41 other individuals. *Id.*

The court concluded that plaintiff's picture was incidental to the main purpose of the brochure, which was to provide information about the hospital's curriculum and programs to prospective students. *Id.* at 157. In reaching this conclusion, the court relied, in part, on undisputed testimony that the plaintiff's photograph was selected from among many photographs taken at the hospital by an independent brochure designer "for the purpose of filing up space on a page." *Id.*

The allegations asserted in Plaintiffs' Amended Complaint are significantly different than the facts of *Williams* and *D'Andrea*. Unlike those cases, the allegations in the Amended Complaint establish a "direct and substantial connection between the appearance of the plaintiff's name or likeness and the main purpose and subject of the work." *See Williams*, 63 F. Supp. 2d at 737 (quoting *D'Andrea*, 972 F. Supp. at 157).

Significantly, the advertisements themselves, which Plaintiffs attached to their Amended Complaint, contradict the Club's argument that Plaintiffs' images were used simply to take up space on the page. While the Club contends that the purpose of the advertisements was to inform the public of a particular event or about a particular DJ's upcoming performance, in most of the advertisements, one of the Plaintiffs' images is featured rather than an image depicting the DJ or the venue. In many of the advertisements, the images of the DJs are either smaller than the

Plaintiff's image or not present at all. (*See* Am. Compl. Exhs. B (ECF No. 13-2); C (ECF No. 13-3); D (ECF No. 13-4); E (ECF No. 13-5); F (ECF No. 13-6); G (ECF No. 13-7); and J (ECF No. 13–9)).

Together with the prominence of Plaintiffs' images, Plaintiffs' allegations directly connect their images to the main purpose of the advertisements. Plaintiffs allege that the purpose of the advertisements was to "attract business to the Club and generate revenue for Defendants," (Am. Compl. ¶ 88), and that such business includes selling food and drinks "in an atmosphere w[h]ere nude and/or semi-nude women entertain the business' clientele." (Am. Compl. ¶ 57.) A reasonable inference from these allegations, which the Court must accept as true at this stage, is that Defendants used Plaintiffs' images in these advertisements in order to entice the public to go to the Club to see Plaintiffs or attractive women like Plaintiffs.

Relying on *Williams*—where the court concluded plaintiff's handsomeness was irrelevant to its incidental use analysis—the Club argues that Plaintiffs' physical attractiveness is immaterial. However, this case is inapposite from *Williams* because of the matter being advertised. In *Williams*, the article at issue was a news article—not an advertisement. Furthermore, even if the article did advertise the memoir, the attractiveness of the plaintiff would not have made the public more or less likely to purchase the memoir. Here, where Defendants were advertising for a nightclub, the attractiveness of the women who visit or associate with the Club could very well influence the public's decision to visit the Club.

Accordingly, Plaintiffs' allegations are sufficient to state a claim under Virginia Code § 8.01–40(A).

## B. Count II: Statutory Business Conspiracy

In Plaintiffs' second cause of action, Plaintiffs allege that Defendants violated Virginia's Business Conspiracy Statute when the Club worked together with "certain third-party graphic designers, independent contractors, DJs, social media consultants and/or others, named herein as DOES 1 THROUGH 5, to misappropriate Plaintiffs' images, repurpose these images, create the subject advertisements using Plaintiffs' repurposed images, and publish the subject advertisements on the Club's social media pages." (Am. Compl. ¶ 98.)

Virginia Code § 18.2–499(A) makes it unlawful, in part, for "[a]ny two or more persons" to "combine, associate, agree, mutually undertake or concert together for the purpose of [] willfully and maliciously injuring another in his reputation, trade, business or profession by any means whatever." While Virginia Code § 18.2–499 is a criminal statute, civil relief is afforded by Virginia Code § 18.2-500(A), which provides that a party may sue for damages when the party is "injured in his reputation, trade, business or profession by reason of a violation of § 18.2-499."

In order to succeed on a claim for business conspiracy, a plaintiff must prove the following elements: "(1) concerted action; (2) legal malice; and (3) causally related injury." *Schlegel v. Bank of Am., N.A.*, 505 F. Supp. 2d 321, 325 (W.D. Va. 2007). To show a concerted action, a plaintiff must establish that the defendants "combined together to effect a preconceived plan and unity of design and purpose." *Id.* at 326 (quoting *Bay Tobacco, LLC v. Bell Quality Tobacco Prods., LLC*, 261 F. Supp. 2d 483, 499 (E.D. Va. 2003)). In addition to proving concerted action, the "plaintiff must prove that the conspirators acted with legal malice, that is, acted intentionally, purposefully, and without legal justification." *CVLR Performance Horses, Inc. v. Wynne*, 977 F. Supp. 2d 598, 604 (W.D. Va. 2013). With respect to this element, although the plaintiff "need not prove that the defendant's primary and overriding purpose was to injure the plaintiff's reputation,

10

trade, or business . . . the plaintiff must prove that such a purpose was at least *one* of the purposes of the conspiracy." *Schlegel*, 505 F. Supp. 2d at 326.

Furthermore, at the motion to dismiss stage, business conspiracy claims, like fraud claims, must satisfy a heightened pleading standard. *See Gov't Emps. Ins. Co. v. Google, Inc.*, 330 F. Supp. 2d 700, 706 (E.D. Va. 2004). Business conspiracy claims "must be pleaded with particularity, and with more than 'mere conclusory language.'" *Id.* (quoting *Bay Tobacco*, 261 F. Supp. 2d at 499).

The Club argues that Plaintiffs have failed to state a claim for statutory business conspiracy because Plaintiffs have not alleged a concerted action. (Club's Mem. at 12.) The Club also argues that Plaintiffs have not alleged facts to establish that the Club was acting with legal malice. (Club's Mem. at 13.) The Club acknowledges that Plaintiffs have alleged that Defendants took actions that may have had the *effect* of injuring Plaintiffs' trade or business, but it argues that this is not sufficient to state a claim because Plaintiffs needed to allege that injury was the Club's *purpose*. (Club's Reply at 5–6.)

Even assuming that Plaintiffs' Amended Complaint has sufficiently alleged concerted action, the Amended Complaint fails to allege the requisite legal malice—*i.e.*, the Amended Complaint does not sufficiently allege that defendants acted with the intent to injure Plaintiffs' reputation, trade, or business. According to the Amended Complaint, the purpose of the Club's and the Doe Defendants' concerted efforts in creating these advertisements was to "deprive Plaintiffs of the fair market value of their professional modeling services that they would have obtained had [the Club] and its co-conspirators operated through legal channels, and thus secure[d] for La Rumba free advertising." (Am. Compl. ¶ 104.) Despite these conclusory allegations regarding Defendants' motives, the facts alleged do not lead to the plausible inference that Defendants conspired with the intention of depriving Plaintiffs of the fair market value of their

professional modeling services. *See Philips*, 572 F.3d at 180 ("[T]he court 'need not . . . accept as true unwarranted inferences, unreasonable conclusions, or arguments.'" (quoting *Kloth v. Microsoft Corp.*, 444 F.3d 312, 319 (4th Cir. 2006))). Plaintiffs' Amended Complaint contains no factual or plausible basis for why Defendants would act with such intent. Rather, the reasonable inferences from Plaintiffs' allegations are that Defendants acted with the intention of securing free advertising for the Club and that depriving Plaintiffs of the fair market value of their professional modeling services was simply a byproduct of that goal.[3]

Accordingly, because Plaintiffs have failed to allege facts sufficient to support the conclusion that Defendants acted with the intention of injuring Plaintiffs' trade, reputation, or business, Plaintiffs' allegations are insufficient to support a plausible claim for business conspiracy. Consequently, the undersigned recommends the Club's Motion to Dismiss Plaintiffs' Claim for Business Conspiracy be granted and Plaintiffs' claim be dismissed without prejudice.[4]

---

[3]     Plaintiffs' argument in their brief in opposition bolsters the conclusion that they have failed to state a claim. Plaintiffs argue that they have alleged that "the purpose of misappropriating Plaintiff[s'] images was to *effectively force* Plaintiffs to work for [the Club], for free." (Pl.'s Mem. at 8 (emphasis added).) With this statement, Plaintiffs acknowledge that Defendants' actions may have had the *effect* of making Plaintiffs work for free, but that that *effect* was not Defendants' intent.

[4]     Plaintiffs seek leave to file a second amended complaint to address any deficiencies in their Amended Complaint. (Pl.'s Mem. at 14.) The Supreme Court has instructed courts to freely allow amendments in the absence of considerations such as undue delay, bad faith, repeated failure to cure deficiencies, undue prejudice to the opposing party, or futility of the amendment. *Foman v. Davis*, 371 U.S. 178, 182 (1962); *see also Edwards v. City of Goldsboro*, 178 F.3d 231, 242 (4th Cir. 1999) ("The law is well settled 'that leave to amend a pleading should be denied *only when* the amendment would be prejudicial to the opposing party, there has been bad faith on the part of the moving party, or the amendment would be futile.'" (quoting *Johnson v. Oroweat Foods Co.*, 785 F.2d 503, 509 (4th Cir. 1986))). The Club has not argued that they would be prejudiced by the amendment or that amendment would be futile. Consequently, Plaintiffs' request for leave to amend should be granted.

### C. Counts III and IV: Lanham Act

In Plaintiffs' third and fourth causes of action, Plaintiffs allege that Defendants violated § 43(a) of the Lanham Act.[5] In Count III, Plaintiffs claim that Defendants violated § 43(a)(1)(A), the false advertising provision of the Lanham Act, because the advertisements made it appear that Plaintiffs worked at or endorsed the Club, leading to consumer confusion about Plaintiffs' sponsorship and/or employment at the Club. (Am. Compl. ¶¶ 114–23.) In Count IV, Plaintiffs claim that Defendants violated § 43(a)(1)(B), the false association provision of the Lanham Act, because Defendants' use of Plaintiffs' images created the false impression that Plaintiffs were affiliated, connected, or otherwise associated with the Club. (Am. Compl. ¶¶ 124–32.)

In their motion to dismiss these two claims, the Club argues that Plaintiffs cannot maintain an action under the Lanham Act because Plaintiffs lack standing. The Club also argues that, even

---

[5]     Section 43(a) of the Lanham Act provides as follows:

(1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—

(A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or

(B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities,

shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125(a)(1).

if Plaintiffs did have standing, the allegations of the Amended Complaint fail to state a claim for false association or false advertising.

1. Lanham Act Standing

The Club argues that Plaintiffs lack standing to sue under the Lanham Act because Plaintiffs have failed to allege the two requirements necessary for standing: (1) that they fall within the Lanham Act's zone of interests and (2) that their damages were proximately caused by Defendants' violations of the Lanham Act.

*a. Zone of Interests*

In order to maintain a claim for either false association or false advertising under the Lanham Act, "a plaintiff's claim must fall within the 'zone of interests' protected by the statute." *Belmora LLC v. Bayer Consumer Care AG*, 819 F.3d 697, 707 (4th Cir. 2016) (quoting *Lexmark International, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 127 (2014)).[6] "The scope of the zone of interests is not 'especially demanding,' and the plaintiff receives the 'benefit of any doubt.'" *Id.* (quoting *Lexmark*, 572 U.S. at 130). To determine if a plaintiff falls within the "zone of interests" of the Lanham Act, courts have looked to the Lanham Act's stated purpose. *See, e.g., id.* ("Because the Lanham Act contains an 'unusual, and extraordinarily helpful' purpose statement

---

[6]    In *Lexmark International, Inc. v. Static Control Components, Inc.*, 572 U.S. 118 (2014), the Supreme Court explained the standing requirements for a claim under the Lanham Act. In *Lexmark*, the plaintiff brought only a claim for false advertising. *Id.* at 120. However, since that decision, numerous federal courts, including the Court of Appeals for the Fourth Circuit, have applied Lexmark's standing requirement to claims for false association. *See, e.g., Belmora LLC v. Bayer Consumer Care AG*, 819 F.3d 697, 710–12 (4th Cir. 2016) (applying *Lexmark* to both false advertising and false association claims); *Int'l Found. of Emp. Ben. Plans, Inc. v. Cottrell*, No. CIV. WDQ–14–1269, 2015 WL 127839, at *3 (D. Md. Jan. 7, 2015) ("[T]here is no reason to think the Supreme Court would apply different standing requirements to a false designation claim.").

in § 45, identifying the statute's zone of interests 'requires no guesswork.'" (quoting *Lexmark*, 572 U.S. at 131)). Such purpose provides:

> The intent of this chapter is to regulate commerce within the control of Congress by making actionable the deceptive and misleading use of marks in such commerce; to protect registered marks used in such commerce from interference by State, or territorial legislation; to protect persons engaged in such commerce against unfair competition; to prevent fraud and deception in such commerce by the use of reproductions, copies, counterfeits, or colorable imitations of registered marks; and to provide rights and remedies stipulated by treaties and conventions respecting trademarks, trade names, and unfair competition entered into between the United States and foreign nations.

15 U.S.C. § 1127. As the Supreme Court of the United States observed in *Lexmark*, most of the statute's stated goals are relevant to false association cases, whereas "a typical false-advertising case will implicate only the Lanham Act's goal of 'protect[ing] persons engaged in [commerce within the control of Congress] against unfair competition.'" *Lexmark*, 572 U.S. at 131 (alterations in original). In order to fall within the zone of interests for false advertising claims, "a plaintiff must allege an injury to commercial interest in reputation or sales." *Id.* at 131–32.

In this case, Plaintiffs have adequately alleged that they fall within the zone of interests of the Lanham Act for their false advertising claim. Plaintiffs allege that the modeling industry "place[s] a high degree of value of their good will and reputation, which is critical in order to maximize their earning potential." (Am. Compl. ¶ 21.) Plaintiffs allege this causes them to be "necessarily selective concerning the companies, and brands, for which they model." (Am. Compl. ¶ 21.) They also allege that Defendants' unauthorized use of their images creates the false impression that Plaintiffs are associated with or endorse the Club which "substantially injures their careers," (Am. Compl ¶¶ 73–74), and "deprives them of income they are owed related to the commercialization of their images." (*Id.* ¶ 72.) The reasonable inference from these allegations, which this Court must accept as true on a motion to dismiss, is that Defendants' unauthorized use

of Plaintiffs' images injured Plaintiffs' commercial interest in their reputations because Defendants' use made it appear that Plaintiffs worked for, or endorsed, a nightclub featuring nude or semi-nude women. Given this inference, Plaintiffs have sufficiently alleged that they suffered "an injury to commercial interest in reputation and sales" for the purpose of their false advertising claim. *See Geiger v. Omega Restaurant & Bar, LLC*, 2:21-cv-256 (E.D. Va. Oct. 22, 2021), Dkt. 39 at 16 (concluding model-plaintiffs fell withing the zone of interest of the Lanham Act for their false advertising claim where they alleged their commercial interest in their reputation was injured by defendant-nightclub's unauthorized use of their images).

Likewise, Plaintiffs' allegations are sufficient to bring them within the Lanham Act's zone of interests on their false association claim. Plaintiffs have alleged that Defendants' use of Plaintiffs' images "create[ed] a false impression to potential customers that Plaintiffs worked at and/or endorsed the Club," (Am. Compl. ¶ 71), and that such use "deprives [Plaintiffs] of income they are owed relating to the commercialization of their images." (Am. Compl. ¶ 72.) Plaintiffs' claim, if substantiated, would advance the enumerated purpose in § 45 of "protect[ing] persons engaged in . . . commerce against unfair competition." 15 U.S.C. § 1127; *see Ullah v. Linkenauger*, No. 1:20CV634, 2020 WL 9459338, at *6 (E.D. Va. Oct. 2, 2020) (finding that plaintiff "plausibly alleged, directly and through reasonable inferences, that he has traded on and commercialized his name and image as a basketball instructor and that Defendants have essentially misappropriated that commercialized name and image").

Relying on *Pinder v. 4716 Incorporated*, 494 F. Supp. 3d 618 (D. Az. 2020), the Club nonetheless argues that Plaintiffs are not within the zone of interests because Plaintiffs were not in direct or indirect competition with Defendants. (*See* Def.'s Mem. Supp. Mot. Dismiss, at 14 ("If the parties are not directly in competition, a plaintiff must show that the injury plaintiff suffered is

harmful to the plaintiff's ability to compete with the defendant." (quoting *Pinder*, 494 F. Supp. 3d at 636) (internal citation and quotation marks omitted))). However, in *Lexmark*, the Supreme Court specifically rejected the notion that a claim under the Lanham Act can only be maintained by a competitor. *Lexmark,* 572 U.S. at 136 (rejecting "a rule categorically prohibiting all suits by noncompetitors"). Therefore, the fact that Plaintiffs and Defendants are not competitors does not mean Plaintiffs fall outside the Lanham Act's zone of interests.

### b. Proximate Cause

Having concluded that Plaintiffs have sufficiently alleged that they fall within the zone of interests of the Lanham Act, the undersigned turns to the Club's argument that Plaintiffs lack standing because they have not alleged that their injuries were proximately caused by violations of the Lanham Act. To satisfy the proximate cause requirement, a plaintiff "ordinarily must show economic or reputational injury flowing directly from the deception wrought by the defendant's advertising; and that that occurs when deception of consumers causes them to withhold trade from the plaintiff." *Lexmark*, 572 U.S. at 133; *see also Belmora*, 819 F.3d at 712 (applying the proximate cause standard to a false association claim).

The Club argues that Plaintiffs have failed to adequately allege that their injuries were proximately caused by violations of the Lanham Act. (Club's Mem. at 15.) According to the Club, Plaintiffs have alleged that the "consumers" that were deceived by the advertisements were persons who went to the Club, and Plaintiffs have not shown how the deception of the Club's consumers would have caused consumers to withhold trade from Plaintiffs. (Club's Mem. at 15.) In Plaintiffs' brief in opposition, Plaintiffs fail to respond to Defendants' argument on proximate cause. Nevertheless, liberally construing the allegations in Plaintiffs' Amended Complaint, Plaintiffs

have sufficiently—although inartfully—alleged that Defendants' deception proximately caused them harm.

As discussed above, Plaintiffs have alleged that the modeling industry places a "high degree of value on their good will and reputation," and that being associated with the Club (with the implication that they are entertainers), or otherwise endorse the Club, "substantially injures their careers" and "deprives them of income they are owed relating to the commercialization of their [i]mages." (Am. Compl. ¶¶ 21, 73–74.) From these allegations, and given that the plaintiff receives the "benefit of any doubt," the undersigned can infer that, in addition to confusing potential customers of the Club, the images also potentially confused those who might otherwise have paid Plaintiffs for their images or hired them to model. *See Belmora*, 819 F.3d at 707; *see also Geiger v. C&G of Groton, Inc.*, 424 F. Supp. 3d 276, 293 (D. Conn. 2019) (concluding model-plaintiffs had standing to sue under Lanham Act where they alleged that the defendants' misappropriation of their images damaged their reputation, resulting in "injury which could be remedied through the award of damages"); *Ullah*, No. 1:20CV634, 2020 WL 9459338, at *6 (finding plaintiff adequately alleged proximate cause where he "alleged facts from which to draw a reasonable inference that he has sufficiently commercialized his name and image to establish a market presence and that his opportunities to independently market his image and name has been adversely affected by the false association created by Defendants' conduct"). Consequently, Plaintiffs have alleged facts sufficient to show standing under the Lanham Act.

2. False Advertising

In addition to their arguments that Plaintiffs lack standing, the Club also contends that Plaintiffs have failed to adequately allege claims for false advertising or false association. With respect to the false advertising claim, Plaintiffs must establish the following elements:

18

> (1) the defendant made a false or misleading description of fact or representation of fact in a commercial advertisement about his own or another's product; (2) the misrepresentation is material, in that it is likely to influence the purchasing decision; (3) the misrepresentation actually deceives or has the tendency to deceive a substantial segment of its audience; (4) the defendant placed the false or misleading statement in interstate commerce; and (5) the plaintiff has been or is likely to be injured as a result of the misrepresentation, either by direct diversion of sales or by a lessening of goodwill associated with its products.

*Verisign, Inc. v. XYZ.COM LLC*, 848 F.3d 292, 298–99 (4th Cir. 2017) (quoting *Design Res., Inc. v. Leather Indus. Of Am.*, 789 F.3d 495, 501 (4th Cir. 2015)).

The Club alleges that Plaintiffs have failed to state a claim for false advertising because Plaintiffs have failed to allege that Defendants made any "statement" about Plaintiffs with the use of their images. (Club's Mem. at 16.) The Club also asserts that Plaintiffs have failed to make factual allegations suggesting that the advertisements were misleading or that they were likely to deceive consumers. (Club's Mem. at 17.)

Defendants' arguments are not well-supported. To be liable for false advertising under the Lanham Act, a plaintiff need not allege a specific written or verbal statement. Instead, liability for false advertising under the Lanham Act can arise from the use of "any word, term, name, symbol, or device . . . or misleading description of fact, or false or misleading representation of fact." 15 U.S.C. § 1125; *see Geiger*, 424 F. Supp. 3d at 293 (concluding that advertisements which include an image may create an "allegedly inappropriate association" which "could be impliedly false"); *Handsome Brook Farm, LLC v. Humane Farm Animal Care, Inc.*, 193 F. Supp. 3d 556, 572 (E.D. Va. 2016) ("For liability to arise, the 'contested statement or representation must be either false on its face or, although literally true, likely to mislead and to confuse consumers given the merchandising context.'" (quoting *PBM Prods., LLC v. Mead Johnson & Co.*, 639 F.3d 111, 120 (4th Cir.2011))), *aff'd*, 700 F. App'x 251 (4th Cir. 2017). Here, Plaintiffs have alleged that Defendants' advertisements "create the false impression that Plaintiffs worked at the Club,

endorsed, promoted or sponsored same, or were otherwise associated or affiliated with same." (Am. Compl. ¶ 69.) This allegation sufficiently constitutes an allegation of a false or misleading representation of fact under the Lanham Act. Accordingly, Plaintiffs have adequately pled a claim for false advertising.

3. False Association

The Club also argues that Plaintiffs have failed to state a claim for false association. In order to establish a false association claim under the Lanham Act, a plaintiff must prove the following:

> (1) the Defendants used his name or a word in interstate commerce in connection with goods and services; (2) the Defendants' use of his name or a word was likely to cause confusion, mistake or deception as to the association of the Defendant with the Plaintiff, or the sponsorship, or approval of Defendant's goods or services; and (3) Plaintiff is, or is likely to be, damaged by these acts.

*Ullah*, No. 1:20CV634, 2020 WL 9459338, at *3.

Here, the Club challenges Plaintiffs' allegations on the second and third elements, arguing that Plaintiffs are not famous enough to be recognized by customers viewing the advertisements and thus that Plaintiffs have not adequately alleged consumer confusion. (Club's Mem. at 18–19.) The Club urges this Court to conclude that Plaintiffs' images "would not be commonly recognized in the Richmond, Virginia area." (Club's Mem. at 18.)

Contrary to Defendants' arguments, Plaintiffs have alleged that they are "well-known professional model[s]" (Am. Compl. ¶ 20), and they have identified specific magazines, television shows, and advertisements in which each Plaintiff has appeared.[7] (Am. Compl. ¶¶ 27–56.)

---

[7]     Relying on *Toth v. 59 Murray Enterprises, Inc.*, No. 15 CIV. 8028, 2019 WL 95564, at *6 (S.D.N.Y. Jan. 3, 2019), *aff'd in part, vacated in part, remanded sub nom. Electra v. 59 Murray Enterprises, Inc.*, 987 F.3d 233 (2d Cir. 2021), the Club argues that this Court should undertake an analysis of the recognizability of each Plaintiff's image. (Club's Mem. at 18.) However, *Toth*

Accepting these allegations as true, the Court cannot conclude, as a matter of law, that Plaintiffs' images were not sufficiently recognizable for Plaintiffs to make out a claim for false association. Moreover, "[t]he Fourth Circuit has not recognized celebrity status as a requirement for a § 43 false association claim." *Ullah*, 2020 WL 9459338, at *6. Consequently, because Plaintiffs' allegations sufficiently establish that their images could be recognized, Plaintiffs' allegations also adequately establish that customers who viewed those images may have been confused by Plaintiffs' affiliation with the Club.

The Club also argues that Plaintiffs have not sufficiently alleged that they suffered from a competitive injury. Defendants' arguments suggest that Plaintiffs were required to be in competition with the Club in order for Plaintiffs to adequately state a claim under the Lanham Act. However, as previously discussed, the Supreme Court in *Lexmark* has already decided that a plaintiff need not to be a competitor in order to maintain a claim under the Lanham Act. *Lexmark*, 572 U.S. at 136. Moreover, having already concluded that Plaintiffs have adequately pled that they suffered injuries that were proximately caused by Defendants' unauthorized use of their images, the Court also concludes that Plaintiffs have alleged facts establishing that they have been or are likely to be damaged by Defendants' actions. Therefore, Plaintiffs have adequately *alleged* a claim for false association. As the case proceeds, Plaintiffs will, of course, be required to prove their claims with *evidence* of the damages they incurred as a result of Defendants' actions.

### D. Statute of Limitations and Laches Defenses

Lastly, the Club argues that Plaintiffs cannot pursue claims for violations of Virginia Code § 8.01–40 for their use of several of the images attached to Plaintiffs' Amended Complaint because

---

involved cross-motions for summary judgment, and undertaking that analysis here would require the Court to exceed the bounds of the scrutiny permitted on review of a 12(b)(6) motion to dismiss.

the publication dates of those images place the claims outside of the applicable five-year statute of limitations. (Club's Mem. at 21.) Likewise, the Club argues that Plaintiffs' Virginia statutory conspiracy claims are barred by that statute's two-year statute of limitations. (Club's Mem. at 21–22.) Additionally, the Club argues that Plaintiffs' Lanham Act claims are barred by the doctrine of laches. (Club's Mem. at 22–23.)

    1.  Statute of Limitations Defense

The Club argues that some of Plaintiffs' claims under Count I, alleging unauthorized use of Plaintiffs' images published prior to December 13, 2016, are time-barred by a five-year statute of limitations. (Club's Mem. at 21 citing *Lavery v. Automation Mgmt. Consultants, Inc.*, 360 S.E.2d 336, 339 (Va. 1987) (holding five-year statute of limitations governing injury to property applies to claims under Virginia Code § 8.01–40))). Plaintiffs agree that the applicable statute of limitations is five years and that, ordinarily, their claims based on images published prior to December 13, 2016, would be barred. (Pl.'s Mem. at 11.) However, Plaintiffs contend that a series of emergency orders issued by the Supreme Court of Virginia in response to the COVID-19 pandemic (the "Emergency Orders"),[8] effectively tolled the statutes of limitations for a period of 126 days, from March 16, 2020, until July 19, 2020. (Pl.'s Mem. at 11–12.) Therefore, according to Plaintiffs, 126 days must be added to the date on which Plaintiffs' claims were set to expire. (Pl.'s Mem. at 12.) In its Reply Brief, the Club contends that the Supreme Court of Virginia's

---

[8]    The Emergency Orders can be found at https://www.vacourts.gov/news/items/covid/scv_emergency_orders.pdf. Hereafter, each order will be referred to by number. For example, the first emergency order, titled, "*In Re:* Order Declaring a Judicial Emergency in Response to COVID-19 Emergency" and entered on March 16, 2022, shall be referred to as the "First Emergency Order." The second order, titled, "In Re: Order Extending Declaration of Judicial Emergency in Response to COVID-19 Emergency Declaring a Judicial Emergency in Response to COVID-19 Emergency," and entered on Mar. 27, 2020, shall be referred to as the "Second Emergency Order," and so on.

Emergency Orders did not extend the statutes of limitations in all cases; rather, the Emergency Orders only extended the deadline for statutes of limitations that would have expired during the period when the orders were in effect, and since Plaintiffs' claims did not expire between March 16, 2020, and July 19, 2020, the statutes of limitations on Plaintiffs' claims were not affected. (Club's Reply, at 12–13.)

*a. Supreme Court of Virginia's Emergency Orders*

On March 16, 2020, the Supreme Court of Virginia began issuing the Emergency Orders, declaring and extending a judicial emergency in response to the COVID-19 pandemic. The First Emergency Order, entered on March 16, 2020, ordered that all non-essential and non-emergency court proceedings in all circuit and district courts in Virginia be suspended and all deadlines tolled and extended for a period of twenty-one days.

As the pandemic progressed, the Supreme Court of Virginia continued issuing Emergency Orders addressing the pandemic and extending and tolling deadlines. In the Second Emergency Order, entered on March 27, 2020, the Supreme Court of Virginia ordered that, except for some enumerated exceptions:

> [A]ll applicable deadlines, time schedules and filing requirements, including any applicable statute of limitations which would otherwise run during the period this order is in effect, are hereby tolled and extended, pursuant to Va. Code § 17.1-330(D), for the duration of this Order.

(Second Emergency Order at 1.)

In the Third Emergency Order, entered April 22, 2020, the Supreme Court of Virginia ordered that the "terms and requirements of this Court's First and Second Orders, as amended and clarified, shall continue in full force and effect through May 17, 2020, as if fully set forth herein." (Third Emergency Order at 1.) Likewise, in the Fourth, Fifth, and Sixth Emergency Orders, entered May 6, 2020, June 1, 2020, and June 11, 2020, respectively, the Supreme Court of Virginia

modified and extended the declaration of judicial emergency. Regarding tolling in these subsequent orders, the Supreme Court of Virginia ordered the tolling of the statutes of limitations and other case-related deadlines "[a]s provided in the First [and] Second" Emergency Orders. (Fourth Emergency Order at 3; Fifth Emergency Order at 2; Sixth Emergency Order at 2.)

In the Seventh Emergency Order, entered July 8, 2020, the Supreme Court of Virginia ended the tolling period: "The tolling period as a result of the Judicial Emergency for such statutes of limitation and deadlines shall be limited to March 16, 2020 through July 19, 2020. This period of tolling shall not be counted for purposes of determining statutes of limitation or other case-related deadlines." (Seventh Emergency Order at 2.)

### b. Legal Analysis

This Court applies Virginia law concerning statutes of limitations to determine whether such statutes bar a claim arising from Virginia law. *Adams v. Am. Optical Corp.*, 979 F.3d 248, 255 (2020). "The Court is bound to apply not only Virginia statutes of limitation, but also Virginia rules and laws that are 'an integral part of the state statute of limitations.'" *Zamma Canada Ltd. v. Zamma Corp.*, No. 3:20CV353, 2020 WL 7083940, at *5 (E.D. Va. Dec. 3, 2020) (quoting *Walker v. Armco Steel Corp.*, 446 U.S. 740, 746 (1980)). The Supreme Court of Virginia's Emergency Orders are integral to a statutes of limitations' analysis, given the Orders' tolling provisions. *Ceriani v. Dionysus, Inc.*, No. 4:21-cv-108, — F. Supp. 3d —, 2022 WL 1185896, at *3 (E.D. Va. Apr. 20, 2022).

Neither the Supreme Court of Virginia nor the Virginia Court of Appeals, however, has decided whether the Emergency Orders tolled the deadlines for all cases, or for only those cases

where the statute of limitations would have otherwise expired between March 16, 2020, and July 19, 2020 (the "Tolling Period"). Additionally, there is a split in authority among other courts.[9]

To interpret the meaning of the Supreme Court of Virginia's Emergency Orders, federal courts must look to decisions of the Supreme Court of Virginia and the manner in which that Court would interpret the Emergency Orders. *See Fusaro v. Howard*, 19 F.4th 357, 371 n.12 (4th Cir. 2021) ("When interpreting a state statute, we have recognized that federal courts should 'apply the statutory construction rules applied by the state's highest court.'" (quoting *Carolina Trucks & Equip., Inc. v. Volvo Trucks of N. Am., Inc.*, 492 F.3d 484, 489 (4th Cir. 2007))). When interpreting court orders, the Supreme Court of Virginia would apply the same rules that it uses to interpret a statute or written contract. *See Goudreau v. Goudreau*, No. 2720-00-4, 2001 WL 766263, at *2 (Va. Ct. App. July 10, 2001) (unpublished opinion) ("Court orders are subject to the same rules of construction that apply to other written instruments." (citing *Shultz v. Hansbrough,* 76 Va. 817 (1882))).

When interpreting a written instrument, the Supreme Court of Virginia follows the "plain meaning" rule, which means that if the terms of the instrument are "plain and unambiguous," then the court will not look for meaning beyond the instrument itself. *Cap. Com. Properties, Inc. v. Vina Enterprises, Inc.*, 462 S.E.2d 74, 77 (Va. 1995) (quoting *Berry v. Klinger*, 300 S.E.2d 792,

---

[9]    There are several diverging opinions on this issue from federal courts in Virginia and from Virginia circuit courts. *See Ceriani v. Dionysus, Inc.*, No. 4:21-cv-108, — F. Supp. 3d —, 2022 WL 1185896, at *4 (E.D. Va. Apr. 20, 2022) (holding that the Supreme Court of Virginia excluded the Tolling Period from any statute of limitations calculation, regardless of whether it expired during the tolling period); *Winfree v. Hill*, No. 3:21-CV-00039, 2022 WL 2812057, at *5 (W.D. Va. July 18, 2022) (same); *but see Proctor v. AECOM, Inc.*, No. 121CV00033RDAJFA, 2021 WL 3809041, at *4 (E.D. Va. Aug. 26, 2021) (concluding plaintiff's deadline was not extended by the Emergency Orders because the deadline did not fall within the Tolling Period); *English v. Quinn*, No. CL20-2857, 2022 WL 363981, at *3 (Va. Cir. Ct. Feb. 7, 2022) (holding Emergency Orders only tolled statute of limitations which were set to expire during the Tolling Period).

796 (Va. 1983)). As with other written instruments, "an order must be interpreted within its four corners." *Smoot v. Commonwealth*, 559 S.E.2d 409, 412 (Va. Ct. App. 2002). A term or phrase is ambiguous if it can reasonably be understood "in more than one way," *Cap. Com. Props.*, 462 S.E.2d at 77 (quoting *Berry*, 300 S.E.2d at 796), or "is difficult to comprehend, is of doubtful import, or lacks clearness and definiteness." *Brown v. Lukhard*, 330 S.E.2d 84, 87 (Va. 1985) (citing *Ayres v. Harleysville Mut. Cas. Co.*, 2 S.E.2d 303, 307 (Va. 1939). If a written instrument is subject to more than one reasonable interpretation, courts must apply the interpretation that will carry out the intent of the instrument's drafter. *JSR Mech., Inc. v. Aireco Supply, Inc.*, 786 S.E.2d 144, 146 (Va. 2016). Tolling statutes, specifically, "should be liberally construed" and not "frittered away by any narrow construction." *Baker v. Zirkle*, 307 S.E.2d 234, 237 (Va. 1983) (quoting *Woodson v. Commonwealth Util., Inc.*, 161 S.E.2d 669, 670 (Va. 1968)).

Having reviewed the Emergency Orders, the undersigned concludes that the orders tolled Plaintiffs' statutes of limitations for 126 days. This conclusion is driven by the language used by the Supreme Court of Virginia. Initially, the Second Emergency Order tolled "any applicable statute of limitations," but limited the scope of this directive by stating, "*which would otherwise run during the period this order is in effect*. . . for the duration of this Order." (Second Emergency Order at 1 (emphasis added).) Standing alone, some ambiguity exists regarding to which class of actions this language should apply. *Compare Ceriani*, 2022 WL 1185896, at *4 ("The language used in the Emergency Orders suggests to the Court that the Supreme Court of Virginia excluded the [T]olling [P]eriod from any statute of limitations calculation, regardless of whether it expired during the [T]olling [P]eriod."), *with English v. Quinn*, No. CL20-2857, 2022 WL 363981, at *3 (Va. Cir. Ct. Feb. 7, 2022) ("[T]he Court interprets this language as the Supreme Court intending to include only statute of limitations that would run during the [T]olling [P]eriod."). Specifically,

the phrase "would . . . run" could refer to a class of actions which have statute of limitation periods that expire during the Tolling Period, or, conversely, it could also refer to all causes of action that have accrued and have statute of limitation periods that are not otherwise tolled (i.e. the statute of limitations has begun to run). Given this ambiguity, this language must be read within the context of the other Emergency Orders.

The Supreme Court of Virginia extended the tolling of the statutes of limitations in its Third, Fourth, Fifth, and Sixth Emergency Orders. Each of those Orders references the Second Emergency Order, stating that "[a]s provided in the First [and] Second" Emergency Orders, the statutes of limitations "shall continue to be tolled during the ongoing Period of Judicial Emergency." (Fourth Emergency Order at 3; Fifth Emergency Order at 2; Sixth Emergency Order at 2; *see* Third Emergency Order at 2 (using slightly different language, "[a]s recognized").) Except for this reference, the Supreme Court of Virginia did not otherwise include in the Fourth, Fifth, or Sixth Emergency Orders the same limiting language as used in the Second Emergency Order. Additionally, had the Supreme Court of Virginia intended the Second Emergency Order to only address a narrower class of actions (those with statutes of limitations expiring during the period of judicial emergency set forth in the First and Second Emergency Orders), it seems logical that it would have expressly addressed the newly affected actions (those with statutes of limitations expiring during the period of judicial emergency set forth in the Third through Six Emergency Orders). The fact that the Supreme Court of Virginia did not do so further supports a more expansive interpretation. Finally, the Seventh Emergency Order, which ended the Tolling Period, provided that the Tolling Period "shall not be counted for purposes of determining statutes of limitation or other case-related deadlines." Similar to the Fourth through Sixth Emergency Orders, this language in the Seventh Emergency Order does not expressly limit its application to statutes

27

of limitation periods that "would otherwise run" during the Tolling Period. *See Ceriani*, 2022 WL 1185896, at *4 (relying, in part, on the Seventh Emergency Order's lack of limiting language to conclude that *all* statutes of limitations were tolled).

Given the more expansive language in the subsequent orders, especially the instruction provided in the Seventh Emergency Order, it appears the Supreme Court of Virginia did not intend to toll only those statutes of limitations set to expire during the Tolling Period. Additionally, the Supreme Court of Virginia has instructed that tolling statutes "should be liberally construed" and not "frittered away by any narrow construction," *Baker*, 307 S.E.2d at 237, and therefore the Emergency Orders' tolling provisions deserve the same liberal instruction. Thus, in light of this liberal construction and the Supreme Court of Virginia's language in the Emergency Orders, the undersigned concludes that any ambiguity which existed in the Second Emergency Order should be resolved in favor of tolling the statutes of limitations applicable to Plaintiffs' claims.

Having determined that the Emergency Orders tolled Plaintiffs' statute of limitations, the next issue is whether, and to what extent, the applicable five-year statute of limitations—tolled for a period of 126 days pursuant to the Emergency Orders—bars Plaintiff's claims. Plaintiff sued for images that Defendant published between January 2016 and October 2019. Thus, the five-year statute of limitations would ordinarily bar such claims if a lawsuit was not filed between January 2021 and October 2023, respectively. Plaintiffs filed the original complaint on December 13, 2021. Thus, absent any tolling, the five-year limitations period would bar Plaintiffs' claims for images published before December 13, 2016. Because of the Emergency Orders' tolling provisions, however, Plaintiffs had an additional 126 days to file suit. Accordingly, the five-year statute of limitations bars claims for images published before August 9, 2016 (i.e. 126 days prior to December 13, 2016). Consequently, the statutes of limitations for claims arising from the images

attached to Plaintiffs' Amended Complaint published on or before August 8, 2016, are time barred.[10]

### 2.  Doctrine of Laches and the Lanham Act Claims

The Club also argues that Plaintiffs' Lanham Act claims based on posts made on or prior to December 12, 2016, are time-barred and should be dismissed. (Club's Mem. at 22–23.)

The Lanham Act does not "does not expressly incorporate a limitations period for § 43(a) claims." *Belmora LLC v. Bayer Consumer Care AG*, 987 F.3d 284, 293 (4th Cir. 2021), *cert. denied*, 142 S. Ct. 483 (2021). Instead, the equitable defense of laches applies to claims for false advertising and false association. *Id.* Although laches applies to Lanham Act claims, the state's analogous statute of limitations is still relevant: "Laches is presumed to bar § 43(a) claims filed outside the analogous limitations period." *Id.* at 294 (*citing PBM Prods., LLC*, 639 F.3d at 121). If the presumption applies to a plaintiff's claims, then the court must determine if the presumption can be overcome. *Id.* at 295. This requires the court to consider whether (1) the plaintiff knew of defendant's use of the images; (2) whether the plaintiff's delay in challenging the use of plaintiff's images "was inexcusable or unreasonable"; and (3) whether the defendant "has been unduly prejudiced" by the plaintiff's delay. *Id.*

Although in certain circumstances, ruling on an affirmative defense such as laches on a motion to dismiss may be appropriate, that is not the case here. *See Plumbers & Steamfitters Union Loc. No. 10 v. Waters*, 451 F. Supp. 3d 543, 548 (E.D. Va. 2020) (recognizing that an affirmative defense can sometimes be reached on a motion to dismiss but only where "all facts necessary to the affirmative defense clearly appear[ ] on the face of the complaint." (alteration in original)

---

[10]    The Club also argues that the statute of limitations has run on Plaintiffs' business conspiracy claim. (Club's Mem. at 21–22.) Because Plaintiffs failed to state a claim for business conspiracy, the Court need not address this argument.

(quoting *Goodman v. Praxair, Inc.*, 494 F.3d 458, 464 (4th Cir. 2007))). The only fact relevant to the laches analysis in Plaintiffs' Amended Complaint is the assertion that Plaintiffs' images "over time, . . . [were] 'pushed' down in time from immediate visibility" on Defendants' social media. (Am. Compl. ¶ 89.) Given the limited facts presented, the Court is unable to weigh the factors laid out in *Belmora*. Because all the facts necessary to laches defense are not contained on the face of the Amended Complaint, the Court cannot conclude, as a matter of law, that Plaintiffs' claims are barred by the doctrine of laches.

### IV.   CONCLUSION

Having considered the Complaint and the parties' briefs, and for the reasons discussed herein, the undersigned RECOMMENDS that the Club's Motion to Dismiss Plaintiffs' second cause of action for Statutory Business Conspiracy be GRANTED and Plaintiffs' claim be DISMISSED WITHOUT PREJUDICE. The undersigned also RECOMMENDS that the Club's Motion to Dismiss regarding Plaintiffs' first cause of action be GRANTED IN PART AND DENIED IN PART, with Plaintiffs' claims based on images published on or before August 8, 2016, being DISMISSED as time barred. The undersigned recommends that the Motion to Dismiss the third and fourth causes of action be DENIED.

The Clerk is directed to file this Report and Recommendation electronically and send a copy to all counsel of record and to the Honorable David J. Novak, United States District Judge.

### NOTICE TO PARTIES

**Failure to file written objections to the proposed findings, conclusions, and recommendations of the Magistrate Judge contained in the foregoing report within fourteen (14) days after being served with a copy of this report may result in the waiver of any right to a *de novo* review of the determinations contained in the report and such failure shall bar**

you from attacking on appeal those findings and conclusions accepted and adopted by the District Judge except upon the grounds of plain error.

/s/
_____
Elizabeth W. Hanes
United States Magistrate Judge

Richmond, Virginia
Date: July 29, 2022

31